# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 16, 2019          Decided August 20, 2019

No. 17-3018

UNITED STATES OF AMERICA,
APPELLEE

v.

PHEERAYUTH BURDEN,
APPELLANT

Consolidated with 17-3019

Appeals from the United States District Court
for the District of Columbia
(No. 1:14-cr-00069-2)
(No. 1:14-cr-00069-3)

*Lindsay C. Harrison*, *pro bono*, argued the cause and filed the briefs for appellant. *James Dawson* entered an appearance.

*Daniel J. Lenerz*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jessie K. Liu*, U.S. Attorney, and *Elizabeth Trosman* and *Elizabeth H. Danello*, Assistant U.S. Attorneys.

Before: HENDERSON, ROGERS and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* ROGERS.

PILLARD, *Circuit Judge*:  The Arms Export Control Act (AECA) criminalizes exporting defense articles without a license.  22 U.S.C. § 2778(b)(2), (c).  Pheerayuth Burden, a U.S.-resident Thai national who ran a business exporting goods from the United States to Thailand, and his export business, Wing-On LLC (collectively, the defendants), exported five assault-rifle magazines and a grenade-launcher mount.  Following a three-week trial, a jury convicted the defendants of conspiracy to violate the AECA, unlawful export in violation of the AECA, and conspiracy to launder money.

The defendants contend that three of the district court's rulings are reversible error.  First, they argue that the court erred in admitting video deposition testimony by a key witness over a Confrontation Clause objection where the government itself rendered the witness "unavailable" at trial by deporting him shortly before trial without first making reasonable efforts to arrange his return.  Second, they challenge a jury instruction defining the "willfulness" element of unlawful exportation of defense articles as requiring only proof that the defendants "acted with knowledge that the conduct was unlawful."  That instruction was inadequate, they contend, because it failed to tie the willfulness finding to the pertinent conduct and law, creating an impermissible risk that the jury relied on evidence that Burden thought he was violating Thai import law.  Third, defendants claim that the district court erred in admitting Burden's non-Mirandized statements because it failed to account for his limited English abilities in determining that he was not in custody when agents interrogated him.

We hold that the district court erred in admitting the deposition testimony because the government failed to make reasonable efforts before it deported the witness to procure his presence at trial.  We conclude that the jury instruction was correct as far as it went in instructing the jury to find that "the defendant knew that his conduct was unlawful," and that "willfully" violating the law does not require proof "that a defendant had read, was aware of, or had consulted the licensing provisions of the Arms Export Control Act" as such.  Appellants' Appendix (App.) 66.  But we suggest clarification of the willfulness instruction to more squarely require a finding that defendants were aware of and knowingly violated their legal obligation not to commit the charged *actus reus*.  A case such as this one—that includes evidence of consciousness of guilt relating to distinct *actus reus* arguably violating different, uncharged legal obligations—creates some risk of the jury relying on evidence of consciousness of guilt unrelated to the charged crime.  We affirm the district court's determination that Burden was not in custody because, even assuming language proficiency is relevant to the custody inquiry, a reasonable officer would not have thought Burden's imperfect English meant a reasonable person in his position would have believed himself detained during the interview.

Because the error we identify was not harmless, we vacate the judgments and remand for proceedings consistent with this opinion.

## BACKGROUND

### A.  Legal Background

The AECA establishes executive-branch control over the export and import of "defense articles," meaning arms or other military items.  *See* 22 U.S.C. § 2278.  It authorizes the

President, "[i]n furtherance of world peace and the security and foreign policy of the United States," to control the export of defense articles and services, designate which items count as defense articles and services, and promulgate regulations for those purposes. *Id.* § 2778(a)(1). The designated defense articles make up the United States Munitions List (the Munitions List or the List). *Id.* With certain enumerated exceptions, "no defense articles or defense services designated by the President" as part of the Munitions List "may be exported or imported without a license for such export or import, issued in accordance with" the AECA and its associated regulations. *Id.* § 2778(b)(2). The State Department is responsible for issuing licenses. *See id.*; 22 C.F.R. §§ 120.1, 120.20. The decision whether to issue an export license implicates sensitive issues of national security and foreign policy. It must "take into account whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of . . . arms control or nonproliferation agreements or other arrangements." 22 U.S.C. § 2778(a)(2). The statute criminalizes "willfully violat[ing] any provision of this section . . . or any rule or regulation issued under this section." *Id.* § 2278(c). It thus criminalizes willfully exporting defense articles without a license.

The President delegated to the Secretary of State the authority to designate defense articles and promulgate regulations under the AECA, *see* Exec. Order No. 13637, 78 Fed. Reg. 16,129 (2013); 22 C.F.R. § 120.1(a), and the Secretary accordingly promulgated the International Traffic in Arms Regulations (ITAR), 22 C.F.R. §§ 120.1-130.17. The ITAR prohibits exporting defense articles and services without "obtaining the required license or other written approval" from

the appropriate office of the State Department. 22 C.F.R. § 127.1(a). The ITAR also includes the Munitions List, which runs to over forty pages in the Code of Federal Regulations. *See id.* § 121.1. The covered defense articles are described with varying levels of specificity, such as "[r]iflescopes manufactured to military specifications," *id.* (Category I(f)), "[g]uns over caliber .50," *id.* (Category II(a)), "[i]ron powder . . . with particle size of 3 micrometers or less produced by reduction of iron oxide with hydrogen," *id.* (Category V(c)(4)(i)(B)), and "[h]elmets . . . providing a protection level equal to or greater than NIJ Type IV," *id.* (Category X(a)(6)). The convictions in this case relate to items in Category I(h) of the Munitions List: "Components, parts, accessories and attachments" for the firearms listed in Category I(a)-(g). *See* App. 89-90.

## B. Factual and Procedural Background

Burden started Wing-On LLC (Wing-On), a freight-forwarding business that shipped American goods to Thailand, around 2008. In 2010, Kitibordee Yindeear-Rom became one of Burden's customers. A Thai national living in Thailand, Yindeear-Rom had a business importing many different types of goods from the United States to Thailand. As part of that business, he helped his customers get gun parts and accessories from the U.S. that they could not purchase directly because U.S. companies would neither accept Thai credit cards nor ship the parts to Thailand. According to Yindeear-Rom, Burden initially ordered gun parts for him from U.S. vendors, received them in the United States, then shipped them to Thailand. Supplemental Appendix (S.A.) 291A-91B. Yindeear-Rom later began placing the orders himself using a debit card attached to a U.S. bank account Burden opened. S.A. 294-96, 479. Yindeear-Rom testified in his deposition that he reimbursed Burden for the purchases he made on Burden's

debit card by transferring money to Thai bank accounts belonging to Burden and Burden's associate. S.A. 298-300. Neither Burden nor Wing-On had a license to export defense articles on the Munitions List.

In October 2013, Yindeear-Rom took a vacation to the United States, where he was stopped and interviewed by Department of Homeland Security (DHS) agents. He was arrested two days later for conspiracy to violate American export laws. He later pleaded guilty and was sentenced to thirty-six months in prison. At Yindeear-Rom's initial court appearance, the DHS agents saw in the courtroom two people they believed to be Burden's wife and roommate, respectively. Concerned that Burden might have been alerted to the investigation, the agents went immediately to Wing-On's warehouse. Burden was not there, but the agents met one of his employees, who helped the agents call him. They called him again later that day and arranged an interview for that evening at the warehouse.

The DHS agents interviewed Burden in English without an interpreter. They did not advise Burden of his rights with the familiar warnings officials must give suspects in custodial interrogation under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). At the beginning of the interview, one of the agents gave the following preamble (recounted here with Burden's affirmative interjections omitted):

> We are federal agents for the U.S. Government so I have to let you know that you have to be honest with us[,] okay? If you don't want to answer something, you don't have to answer but you cannot lie to us. All right? And you can't withhold relevant information. If you do, that is a crime.

Okay?  Punishable by up to five years in prison so
just please be honest.

App. 174.  The agent then asked, "Is your English good?"  *Id.*
Burden replied, "A little bit."  App. 175.  "If there's anything
that I say that you don't understand, ask me," the agent said.
*Id.*  "Okay," Burden replied.  *Id.*  During the interview, Burden
admitted he had shipped gun parts to Yindeear-Rom and
falsified customs declarations.  App. 266-71.  The agents did
not arrest Burden at the end of the interview.  S.A. 420-21.  The
court's eventual admission of Burden's statement at his trial
over defense objections is the subject of his *Miranda* claim on
appeal.  App. 429-33.

Burden was arrested six months later, in May 2014.  Trial
was initially scheduled for November 2015, but was continued
twice, first to April 2016 and then to September 2016.  The
district court granted the second continuance because many
documents remained to be translated into English.  The court
noted that the defense "can't actually do this without translated
documents" and that "it's not that [the defense has] been less
than diligent about it."  App. 381.  That continuance introduced
a wrinkle into the trial, however:  Yindeear-Rom was
scheduled to be released from prison in June 2016, three
months before the new trial date, and was to be deported after
his release.  The government had a clear path to remove
Yindeear-Rom upon his release because he had stipulated when
he pleaded guilty to an order of removal that would "render[]
him permanently inadmissible to the United States," which
assured that the government, "promptly upon his release from
confinement . . . may execute the order of removal according
to the applicable laws and regulations."  App. 47 (alteration in
original).  The government in February 2016 moved to take
Yindeear-Rom's deposition under Federal Rule of Criminal
Procedure 15, which governs depositions taken to preserve a

potential witness's testimony for trial. S.A. 1; Fed. R. Crim. P. 15(a)(1). The district court granted the motion over the defendants' objections. The defense objected to the deposition for some of the same reasons it asked for the second trial postponement: the government had not produced sufficient discovery to allow them to prepare for Yindeear-Rom's testimony. The court nonetheless allowed the deposition to be taken to preserve evidence in the event that Yindeear-Rom would be unavailable to testify. Yindeear-Rom's videotaped, in-court deposition took place over four days in March and April. The court granted the government's motion to reduce Yindeear-Rom's sentence in exchange for his testimony.

The United States deported Yindeear-Rom to Thailand in April 2016. Even though the government had substantial bargaining leverage before it moved for his sentence reduction, there is no record that it made any efforts before deporting him to secure Yindeear-Rom's presence at trial. It was only once Yindeear-Rom was back in Thailand that the government began to make such efforts.

In seeking to bring Yindeear-Rom back a few months later, the government contacted Yindeear-Rom's counsel by phone and mail. *United States v. Burden*, No. 14-cr-0069 (RMC), 2016 WL 5108010, at *3 (D.D.C. Sept. 20, 2016). Its letter to counsel included a subpoena for Yindeear-Rom's testimony at trial and a promise to help him obtain a visa and to pay his travel expenses, "including but not limited to round-trip airfare, transportation, room, board, and per diem witness fee." *Id.* (quoting letter, S.A. 51). Yindeear-Rom's lawyer "forwarded the letter and subpoena to Mr. Yindeear-Rom in Thailand, but was unable to confirm receipt or make any representations about [his] willingness to testify." *Id.* at *3. The government also sent the letter and subpoena directly to Yindeear-Rom's last known email and physical address in

Thailand. *Id.* at \*4. The government received no response to either, but confirmed that the letter was signed for by "K. Yen," which it believed to be Yindeear-Rom. *Id.* DHS personnel in Thailand eventually reached Yindeear-Rom by phone and learned that he had received the email and letter, but that he "had no desire to travel to the United States to cooperate in any way." *Id.* (quoting DHS Report of Investigation, S.A. 75).

At trial, the court granted the government's motion to admit the Rule 15 deposition over the defendants' objections. Defendants argued that the government should have sought to keep Yindeear-Rom in the country between his release from prison and the trial. The court concluded that the witness was unavailable, and that "the use of a videotaped deposition taken in court, before the trial judge and including the presence of Mr. Burden and cross examination by both defense lawyers," was "a very good substitute" for Yindeear-Rom's live trial testimony "that would allow the jury to observe his demeanor and preserve the Defendants' rights to confront witnesses against them." *Id.* at \*3, \*8.

The government's trial evidence included Burden's statement to DHS agents at the Wing-On warehouse that he mislabeled customs declarations for shipments containing gun parts, and packed gun parts hidden among other items for shipping. App. 269-72. In his defense, Burden highlighted his statements that he took those steps to evade Thai customs. He told the agents that he concealed gun parts among other items because "[y]ou want to hide from the custom in Thailand," App. 271, and that he falsified customs documents "[b]ecause of tax in Thailand," App. 281.

The government, for its part, pointed to circumstantial evidence tending to show that Burden had reason to know that he was violating U.S. arms-export law. For instance, Burden

acknowledged in his statement to DHS agents that people "[n]eed a license" to ship certain things, like gun parts. App. 203-04. Yindeear-Rom received a notice that a seized shipment of gun parts violated the ITAR, *see* S.A. 212-13, and even though he had ordered that shipment through a different shipper (not Wing-On), Yindeear-Rom forwarded the notice to Burden asking what he should do, *see* S.A. 282-83. Yindeear-Rom then testified that the notice he forwarded informed both of them of the requirements of the ITAR. S.A. 369. Burden had also received a notice directly from U.S. Customs and Border Protection that it had seized a rifle scope (controlled under a distinct set of regulations analogous to the ITAR but covering different items) because the scope could not be exported without a license. *See* App. 171.

Further evidence, however, suggested that Burden either did not realize he was shipping real gun parts, or thought it was legal under U.S. export law to ship those parts if they were to be used with toy guns. As part of their business, the defendants shipped BB guns (air guns that shoot small metal balls) and Airsoft toys (which are similar to BB guns and shoot plastic pellets). *See* App. 311-12, 574. Airsoft and BB guns themselves may lawfully be exported without a State Department license. The defense's expert witness on firearms and Airsoft identification testified that an Airsoft toy "looks like a gun in every way, shape or form from the outside, same length, weight, contour, field markings, but it won't kill anybody." S.A. 672-73. They have all the same parts as the real guns they mimic; in fact, real gun parts can be used with Airsoft toys. App. 508-10; S.A. 676, 678. In his statement to DHS agents, Burden said that his Thai customers were not using gun parts "for the gun," but "for the BB gun . . . for the paintball [gun]." App. 259. A Wing-On manager testified that employees were instructed not to ship parts for real guns but that they could ship parts to "be used for toys for Airsoft items."

App. 554-56, 574. Burden affirmed to one of his customers that if a part was for a BB gun "then there's no problem" shipping it. App. 361. That evidence tended to support Burden's defense that he concealed the contents of shipments to evade Thai customs law.

Evidence also showed that Burden tried not to ship real gun parts after realizing it was illegal. Burden sent an email to Yindeear-Rom saying, "I have warned you many times that I do not accept gun parts. . . . Stop sending them to me absolutely!" App. 358. The Wing-On warehouse had a "no-go" shelf for gun parts, where employees would segregate items that they could not lawfully ship. *See* App. 350, 554-55. There was ambiguous evidence suggesting that Wing-On may have ultimately shipped some gun parts on the no-go shelf.

The conflicting evidence regarding Burden's intent occasioned a dispute over the jury instruction defining "willfully" under the AECA. The defendants proposed using the Fifth Circuit pattern jury instruction, which requires the jury to find that a defendant exported articles on the Munitions List without obtaining a license from the Department of State; and "[t]hat the defendant acted 'willfully,' that is, that the defendant knew such license . . . was required for the export of these articles and intended to violate the law by exporting them without such license." App. 99.

Instead, the district court adopted the government's proposed instruction, which described the requisite state of mind as follows:

> [A]n act is done willfully if it is committed with the knowledge that it was prohibited by law or was done in disregard of a known legal obligation. The government must prove that a defendant acted with knowledge that the conduct was unlawful. While

the government must show that a defendant knew that the conduct was unlawful, it is not necessary for the Government to show that a defendant was aware of the specific law, rule, or regulation that the conduct may have violated.

In other words, the government need not prove that a defendant had read, was aware of, or had consulted the licensing provisions of the Arms Export Control Act or the International Traffic in Arms Regulations, or the Munitions List. The government, however, must prove beyond a reasonable doubt, by reference to facts and circumstances surrounding the case, that a defendant knew that the conduct was unlawful.

App. 66; *see* App. 435-37. The jury convicted the defendants on all three counts—conspiracy to violate the AECA, unlawful export in violation of the AECA, and conspiracy to launder money. The defendants timely appealed the district court's admission of Yindeear-Rom's deposition and Burden's statement to DHS, as well as the district court's jury instruction on the definition of "willfully."

## ANALYSIS

### A. Yindeear-Rom Was Not "Unavailable" for Purposes of the Confrontation Clause.

We review legal conclusions regarding the Confrontation Clause *de novo*, and reverse any error unless it was harmless beyond a reasonable doubt. *United States v. Moore*, 651 F.3d 30, 69 (D.C. Cir. 2011) (citing constitutional harmless-error standard in *Chapman v. California*, 386 U.S. 18, 24 (1967)). Because the government concedes that, if it was error, admitting Yindeear-Rom's video deposition testimony instead

of producing him at trial was not harmless, we need only consider the claimed error itself.  *See* Appellee's Br. 55 n.5.

The Confrontation Clause of the Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  Courts have long recognized the critical importance of a criminal defendant's "opportunity to cross-examine and impeach a witness at trial before the jury that will decide his innocence or guilt." *United States v. Lynch*, 499 F.2d 1011, 1022 (D.C. Cir. 1974).  Live witness testimony gives the jury the opportunity to assess the witness's demeanor and allows counsel to adjust examination to other evidence and to the jury's apparent reactions as the witness testifies.  "William Blackstone long ago recognized this virtue of the right to confrontation, stressing that through live testimony, 'and this [procedure] only, the persons who are to decide upon the evidence have an opportunity of observing the quality, age, education, understanding, behavior, and inclinations of the witness.'" *United States v. Yida*, 498 F.3d 945, 950 (9th Cir. 2007) (alteration in original) (quoting 3 William Blackstone, *Commentaries on the Laws of England* 373-74 (1768)).

A testimonial statement by a person who does not appear at trial may be admitted "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004); *see also* Fed. R. Evid. 804(b)(1).  Unavailability and prior opportunity to cross-examine are independent criteria:  Even when a defendant had a prior opportunity to cross-examine the witness, if the government does not establish that the witness is unavailable, the testimony must be excluded. *See id.* at 57.  Here, the parties agree that defendants had an opportunity to cross-examine Yindeear-

Rom during his videotaped deposition. The sole question is whether he was "unavailable" for purposes of the Confrontation Clause.

Defendants argue that Yindeear-Rom was not truly unavailable because the government procured Yindeear-Rom's unavailability by deporting him, and, in any case, it did not make reasonable efforts before it deported him to ensure his presence at trial. For its part, the government contends that there is no *per se* presumption that the government fails the Confrontation Clause's test of good-faith and reasonable efforts when it deports a witness, and that its reasonable, good-faith efforts after it deported Yindeear-Rom sufficed.

As a general matter, a witness is considered unavailable only if the prosecution cannot procure her with good-faith, reasonable efforts. *See Ohio v. Roberts*, 448 U.S. 56, 74 (1980), *abrogated in part on other grounds by Crawford*, 541 U.S. 36. It is the prosecution's burden to establish that its actions meet that test. *Id.* at 74-75. "The law does not require the doing of a futile act" such as producing a witness who has died, but "if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation." *Id.* at 74. "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." *Id.* (alteration in original) (quoting *California v. Green*, 399 U.S. 149, 189 n.22 (1970) (Harlan, J., concurring)). In *Lynch*, we held good-faith but non-exhaustive efforts to find a witness were inadequate to render her unavailable and justify admitting pretrial hearing testimony. 499 F.2d at 1024. We treated the witness as available because she was within the court's jurisdiction and the government had not "inquired at the local hospitals, area police departments, the morgue, or of [the witness's] employer." *Id.* In contrast, a witness whose "whereabouts

were entirely unknown," who had been sent numerous subpoenas at her parents' house, was last heard from outside the jurisdiction, and was unreachable by her family even in case of an emergency was held in *Ohio v. Roberts* to be unavailable even though, as Justice Brennan pointed out in dissent, the government had not followed every possible lead to find her. *Compare* 448 U.S. at 60-61, 75, *with id.* at 79-82 (Brennan, J., dissenting).

When the government seeks to rely on prior recorded statements of a witness on the ground that the witness is unavailable, it bears the burden of establishing that its unsuccessful efforts to procure the witness's appearance at trial were "as vigorous as that which the government would undertake to [secure] a critical witness if it has no [prior] testimony to rely upon in the event of 'unavailability.'" *Lynch*, 499 F.2d at 1023; *see also United States v. Mann*, 590 F.2d 361, 367 (1st Cir. 1978). Where the government itself bears some responsibility for the difficulty of procuring the witness, such as by deporting the witness, the government will have to make greater exertions to satisfy the standard of good-faith and reasonable efforts than it would have if it had not played any role. Failing to factor the government's own contribution to the witness's absence into the Confrontation Clause analysis would warp the government's incentives. "This relatively high good faith standard cannot be satisfied by perfunctory efforts, if the rule is not to sanction the government's procuring depositions of witnesses, especially shaky witnesses, but then discourage attempts to bring the witness to trial so long as the government is satisfied with" the witness's recorded testimony. *Mann*, 590 F.2d at 367. Rather, the analysis of good-faith, reasonable efforts should "include an assessment of the government's affirmative conduct" that allowed the witness to become unavailable "in the first instance." *Yida*, 498 F.3d at 955-56. That analysis should account for the good faith and

reasonableness of the government's deportation of the witness and of its attempts to secure witnesses it does deport.

In a case such as this one, in which the government knew or should have known of the potential need for the witness's testimony before he was deported, the government's duty to make good-faith, reasonable efforts to ensure the witness's presence arises before the witness leaves the United States. Other courts that have addressed this question in the context of witness deportation agree. In *United States v. Tirado-Tirado*, the Fifth Circuit refused to deem unavailable a witness whom the government had deported where the government "failed to make any concrete arrangements with [the witness] prior to his deportation," and only shortly before trial made what the court acknowledged were "fairly exhaustive" efforts to bring him back from Mexico. 563 F.3d 117, 123, 125 (5th Cir. 2009). The government had orally told the witness before deporting him that his appearance would be required if the case went to trial—a step not taken here—but the court faulted it for not taking several other pre-deportation steps that might have encouraged the witness to appear, including serving him with a subpoena or other written notice. *Id*. at 123-24. In *United States v. Foster*, the court followed *Tirado-Tirado* to exclude videotaped depositions notwithstanding that the government had advised the witnesses before deporting them that it might need them to return, promised to allow their reentry and pay for their travel, and collected contact information for them in Mexico. 753 F. App'x 307, 309 (5th Cir. 2018). Emphasizing the constitutional importance of taking "reasonable measures, under the circumstances, that are likely to ensure that the witness will return for trial," the court declined to find the unreachable witnesses "unavailable" because the government had not verified their contact information from the outset, sought alternative contact information, or remained in contact

with them over the months between their deportation and the trial. *Id.* at 312.

The Ninth Circuit in *Yida* similarly recognized "the government's obligation to use 'reasonable means' to 'procure the declarant's testimony' in the context of the government's affirmative role in a witness's deportation," 498 F.3d at 953, and refused to admit testimony from a prior mistrial "when the government itself share[d] some of the responsibility for its inability to produce the witness at [the second] trial," *id.* at 956. The government's efforts were insufficient where it had chosen to detain the admittedly untrustworthy and skittish witness prior to the first trial but, once it had that transcript in hand as a substitute, deported the witness without considering the many alternatives to confinement in federal prison that might have prevented the witness's absence. *Id.* at 959-60.

The First Circuit, too, in *Mann*, excluded deposition testimony of a crucial prosecution witness in lieu of live testimony where, after the deposition, the government had returned the witness's passport and plane ticket that it had seized upon her arrest. 590 F.2d at 366, 368. The court held insufficient the government's later offer to pay to bring the witness back, similar to the government's offer here. *Id.* at 363. "Implicit . . . in the duty to use reasonable means to procure the presence of an absent witness is the duty to use reasonable means to prevent a present witness from becoming absent." *Id.* at 368. Where the government fails to take reasonable steps to prevent a witness from becoming absent, the defendant should not suffer from the government's choice. *See id.*

The cases on which the government relies are not to the contrary. *Foster* distinguishes *United States v. Allie*, 978 F.2d 1401, 1403-08 (5th Cir. 1992), and *United States v. Calderon-*

*Lopez*, 268 F. App'x 279, 289 (5th Cir. 2008), on the basis of extensive efforts the government made before it deported the witnesses in those cases, none of which were made here. *Foster*, 753 F. App'x at 311. And in *United States v. Eufracio-Torres*, it was the defendant who initially opposed the government's motion to detain seven material witnesses pending trial. 890 F.2d 266, 268 (10th Cir. 1989). The court thought it significant that none of those witnesses had been charged with any crime, yet they were detained while defendant Eufracio-Torres was free on bond. *Id*. Eufracio-Torres changed his position to request their detention pending trial only after their depositions were taken—a request the court denied. *Id*. When the witnesses could not be brought back for trial and the government sought to use the depositions, the court held that the government's good-faith, reasonable efforts supported its request: Before they left the country, the government had given the witnesses subpoenas, instructions for reentry, travel reimbursement, appearance fees, and obtained their promises to return to testify. *Id*. No such steps were taken here. The government's reliance on *United States v. Rivera* is similarly misplaced. 859 F.2d 1204, 1207-09 (4th Cir. 1988) (witnesses but not defendant were being detained, and court found no prejudice claimed or suffered from use of witness depositions taken at the witnesses' own request before they were released and voluntarily left the United States).

Under the applicable standard, the government failed to show that Yindeear-Rom was "unavailable" for purposes of the Confrontation Clause. The government's efforts to secure his presence at trial did not begin until after he was deported. *See Burden*, 2016 WL 5108010, at *3-4. Before his deportation, the government did not give Yindeear-Rom a subpoena, offer to permit and pay for him either to remain in the U.S. or to return here from Thailand, obtain his commitment to appear, confirm his contact information, or take any other measures.

*See id.* at \*9.  Its only efforts began once he was out of custody, out of the jurisdiction, and no longer dependent on the government's good graces for lenient treatment.  Yindeear-Rom's eagerness to return to Thailand helped to persuade the district court that further efforts to persuade him to testify at trial would have been futile.  *See id.*  But in these circumstances that eagerness cuts the other way.  Given the government's duty to make good-faith, reasonable efforts before Yindeear-Rom's deportation, "a witness's known reluctance to testify adds to the government's burden to show that it made 'reasonable, good faith efforts' to secure her appearance because it makes her failure to appear voluntarily all the more foreseeable."  *Brooks v. United States*, 39 A.3d 873, 886 (D.C. 2012).  This is a case where the "possibility, albeit remote, that affirmative measures might produce the declarant . . . demand[ed] their effectuation."  *Roberts*, 448 U.S. at 74.  Any chance the government had of securing Yindeear-Rom's appearance at trial would have been far greater had it addressed the problem as soon as it knew it would rely on his testimony.  Instead, its own approach appears to have ensured the futility of the post-deportation efforts.

We recognize that it may not always be reasonable to expect the government to postpone removal until trial—particularly if the government would have to detain the witness in order to keep her in the country.  *See Aguilar-Ayala v. Ruiz*, 973 F.2d 411, 419 (5th Cir. 1992) (enjoining Department of Justice policy of automatically detaining undocumented immigrant material witnesses because "undocumented aliens have an overriding liberty interest in not being detained as material witnesses").  And we assume that "in some cases the need for the criminal defendant to confront the witness at trial (rather than at deposition) might outweigh the material witness' liberty interest in being released immediately," whereas in other cases it will not.  *Id.* (emphasis omitted).  In order to

identify the existence and extent of any such conflict, however, the unavailability inquiry must account for whether the government has addressed potentially reasonable means of securing removable witnesses' live testimony short of detention, such as placing them in "lesser custody," "supplying maintenance, and retaining [their] passport[s] and ticket[s]," and "plac[ing] [them] under subpoena." *Mann*, 590 F.2d at 366; *see also Allie*, 978 F.2d at 1407 (holding that the government's efforts were reasonable where it offered witnesses work permits to keep them in the United States).

Because the government's omissions place its efforts below the standard the Confrontation Clause demands, we need not decide precisely how the government should have sought to prevent the witness from becoming unavailable. While the government's deportation of a witness may sometimes fail the standard of good-faith and reasonable efforts, we reject any *per se* rule that no witness the government deports can be considered unavailable under the Confrontation Clause. Consistent with the fact-intensive nature of the standard, the government decries any *per se* rule, *see* Appellee's Br. at 45-46, the defendants do not advocate one, *see* Appellants' Reply Br. 24 n.12, and no circuit has adopted any such categorical approach.

We hold that the duty to use reasonable means to procure a witness's presence at trial includes the duty to use reasonable efforts to prevent a witness from becoming absent in the first place. The government does not dispute that it made no efforts before deporting Yindeear-Rom to secure his presence at trial. The witness thus was not "unavailable" such that prior testimony could be admitted consistent with the Confrontation Clause. Because admitting his deposition was not harmless beyond a reasonable doubt, we vacate the convictions and remand for a new trial.

**B. Guidance Regarding the Jury Instruction's Definition of "Willfully"**

Although our resolution of the Confrontation Clause issue is sufficient to dispose of this appeal, we provide some guidance regarding the jury instruction's definition of the term "willfully," an issue that was fully briefed and argued.

The parties agree that defendants "willfully" violate the AECA only where they act with knowledge that their conduct is unlawful. The Supreme Court has explained that "willfully" is "a word of many meanings whose construction is often dependent on the context in which it appears." *Bryan v. United States*, 524 U.S. 184, 191 (1998) (internal quotation marks omitted). "As a general matter, when used in the criminal context, a 'willful' act is one undertaken with a bad purpose. In other words, in order to establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Id.* at 191-92 (internal quotation marks omitted). The parties disagree about how specific that knowledge must be under the AECA's willfulness standard.

Defendants argue that the AECA's prohibition on "willfully violat[ing] any provision of this section," 22 U.S.C. § 2778(c), means that they should not have been convicted unless they "were aware of the specific law, rule, or regulation that the[ir] conduct may have violated." Appellants' Br. 17 (alteration in original). Before us, they frame this standard as "requir[ing] the government to prove an individual was aware the items he exported were on the [Munitions List]," *id.* at 18-19, though their requested jury instruction would instead have demanded proof that they knew that there was a license requirement for their exports, App. 99. The heart of defendants' case at trial was that they "had not willfully

violated [the] AECA because they believed the parts were intended for use in Airsoft BB guns, not real guns, and they believed such parts could be exported without a license." Appellants' Br. 12. Under the court's jury instructions, they contend, "intent to violate Thai customs duties or Thai gun control laws could support the jury's finding of willfulness." *Id.* at 31. The government defends the district court's instruction on the ground that "the AECA is not one of the extremely rare, highly technical statutes that the Supreme Court has found to require a heightened willfulness showing," so the government did not have to prove defendants had knowledge of the license requirement or the Munitions List as such. Appellee Br. 16.

As discussed below, because it was ambiguous as to what "conduct" defendants had to know was "unlawful," the district court's jury instruction arguably fell short of the baseline requirement that the *mens rea* relate to the charged *actus reus*. But we believe that the district court correctly instructed that, if defendants knew exporting the charged items without a license was unlawful, they did not need specific knowledge of the Munitions List. Thus, the district court was right that "the government need not prove that a defendant had read, was aware of, or had consulted the licensing provisions of the Arms Export Control Act or the International Traffic in Arms Regulations, or the Munitions List." App. 66. For purposes of the AECA, a requirement of proof that defendants knew the proscribed conduct was unlawful adequately protects against "the danger of ensnaring individuals engaged in apparently innocent conduct." *Bryan*, 524 U.S. at 194.

Most criminal prohibitions require only proof that the crime was committed "knowingly," meaning that the defendant knew of the facts that made his act illegal, even if he did not know the act was illegal. When Congress wants to ensure that

defendants will be convicted only if they have a more culpable state of mind, it limits the crime to conduct that a defendant engages in "willfully." *See id.* at 191-92. The Court has developed an approach to "willfulness" that is calibrated to the statutes in which it appears, consistently reading it to require proof that the defendant had a sufficiently culpable state of mind, but not to require proof so specific as to stymie the statute's enforcement. It has required proof that a defendant know which law he was breaking in only two contexts: criminal tax evasion, and currency structuring.

In *Cheek v. United States*, a tax case, the Court explained Congress's inclusion of a willfulness requirement for felony tax-evasion as resting partly on the recognition that "[t]he proliferation of statutes and regulations has sometimes made it difficult for the average citizen to know and comprehend the extent of the duties and obligations imposed by the tax laws." 498 U.S. 192, 199-200 (1991). The Court held that the willfulness requirement could be defeated by the defendant's good-faith belief that he "was not a person required to file a return or to pay income taxes and that wages are not taxable income," even if that belief was unreasonable. *Id.* at 203.

In *Ratzlaf v. United States*, the Court interpreted "willfully" in the context of a statute criminalizing "currency structuring." 510 U.S. 135, 136, 144 (1994). The anti-structuring law prohibited a customer from breaking up a large financial transaction into multiple smaller ones to avoid triggering a bank's legal duty to report transactions over $10,000. *Id*. at 145. The Court held that "willfulness" meant that the defendant had to be aware not only of reporting obligations applicable to banks, but of his own distinct obligation not to structure his transactions for the purpose of avoiding triggering the bank's obligation to report. *Id*. at 137-38. In other words, "[t]o convict Ratzlaf of the crime with

which he was charged . . . the jury had to find he knew the structuring in which he was engaged was unlawful." *Id*. at 149.

In *Bryan*, which concerned unlicensed firearms-dealing, the Court concluded that "requiring only knowledge that the conduct is unlawful [was] fully consistent" with Congress's purpose in adding a willfulness requirement to the firearms statute "to protect law-abiding citizens who might inadvertently violate the law." 524 U.S. at 195 n.23. *Bryan* distinguished the firearms law before it from the "highly technical" statutes at issue in *Cheek* and *Ratzlaf*, which had justified "'carv[ing] out an exception to the traditional rule' that ignorance of the law is no excuse and requir[ing] that the defendant have knowledge of the law"—that is, the specific law he violated. *Bryan*, 524 U.S. at 194-95 (quoting *Cheek*, 498 U.S. at 200).

Following *Bryan*, most courts of appeals to consider the issue have interpreted the AECA's requirement that a violation be "willful" not to require specific awareness of the Munitions List as such. What they have required—as we do here—is proof that defendants knew it was illegal to export the items they shipped without a license. *See United States v. Henry*, 888 F.3d 589, 598-600 (2d Cir. 2018) ("[W]illfulness requires only that the defendant know that what he was doing was illegal, and not that he know that his conduct was prohibited under a specific AECA provision or related regulation."); *United States v. Bishop*, 740 F.3d 927, 932-33 (4th Cir. 2014) (government need not show defendant knew "that the ammunition was specifically covered by the AECA," but only that he had "general knowledge of an export's illegality"); *United States v. Chi Mak*, 683 F.3d 1126, 1138 (9th Cir. 2012) (affirming instruction that conviction did not require proof that "the defendant had read, was aware of, or had consulted the specific regulations governing his activities"); *United States v. Roth*,

628 F.3d 827, 835 (6th Cir. 2011) (the AECA "does not require a defendant to know that the items being exported are on the Munitions List," but only "knowledge that the underlying action is unlawful"); *United States v. Tsai*, 954 F.2d 155, 160-62 & n.3 (3d Cir. 1992) (jury need not find that defendant "knew all of the specifics of the law," but "what it had to find was that that the defendant knew that he could not export that particular item"); *United States v. Murphy*, 852 F.2d 1, 6-7 (1st Cir. 1988) (requiring proof that "defendant must know that his conduct in exporting from the United States articles proscribed by the statute is violative of the law," but rejecting requirement that he must know specifically that the article was on the Munitions List or that there was a licensing requirement).

The Eleventh Circuit in *United States v. Wenxia Man* characterized the willfulness requirement of the AECA as more demanding than that of the statute in *Bryan*, but its bottom line is not materially different from that of the other circuits. *See* 891 F.3d 1253, 1268 (11th Cir. 2018). That court hewed to its pre-*Bryan* precedent that "aware[ness] of the generally unlawful nature of [one's] actions is insufficient," but was satisfied with proof "that a conspirator actually knew that it was unlawful to export the [items] and intentionally violated [the] known legal duty not to export [them]." *Id.* (internal quotation marks omitted) (alterations in original) (quoting *United States v. Adames*, 878 F.2d 1374, 1377 (11th Cir. 1989)). The Fifth Circuit held in *United States v. Hernandez* that the AECA demands a finding that the defendant "knew he was unlawfully exporting weapons on the Munitions List," but that case predated *Bryan*, *Cheek*, and *Ratzlaf*. 662 F.2d 289, 292 (5th Cir. 1981). The Seventh Circuit did so more recently, but it, too, took no account of those Supreme Court cases. *See United States v. Dobek*, 789 F.3d 698, 700 (7th Cir. 2015).

26

We hold that the district court's jury instruction was correct insofar as it rejected defendants' position that the willfulness requirement in the AECA is akin to those at issue in *Cheek* and *Ratzlaf*, and clarified that the government need not prove defendants knew the specific law their conduct violated.

That does not quite resolve the issue, however, because of ambiguity in the meaning of "conduct" in the instruction that a willful violation of the AECA requires that the defendant "acted with knowledge that his conduct was unlawful." App. 66. More is required where, as here, there is evidence of willfully unlawful conduct apart from the charged offenses, creating a risk that the jury may consider any and all evidence of the defendant's guilty mind—whatever its object—as supporting willful commission of the charged offense. The willfulness instruction arguably fell short in not specifying that the unlawful "conduct" the jury must find the defendants to have willfully done was the *actus reus* that violated the AECA: unlawfully exporting the magazines and mount without a license. To be sure, the rest of the instruction made clear that the *actus reus* of the charged offense was exporting the items without a license, and we review jury instructions as a whole. *United States v. McGill*, 815 F.3d 846, 888 (D.C. Cir. 2016). But we nonetheless detect a potential problem specific to the instruction's discussion of willfulness—an issue that is both of central importance and easily muddied. It is natural enough that jurors who are told they may convict upon finding the defendants did the requisite act, so long as the defendant had a guilty mind, may not parse the object of the guilty mind. To prompt that important precision, the instruction's definition of "willfully"—the word at issue here—should specify that the *actus reus* was the only "conduct" to which defendants' guilty mental state could apply for a finding of willfulness.

The requirement that the *mens rea* relate to the charged *actus reus* is the baseline for any criminal mental standard. *See Dixon v. United States*, 548 U.S. 1, 6 (2006) ("[C]riminal liability is normally based upon the concurrence of two factors, an evil-meaning mind [and] an evil-doing hand." (second alteration in original) (internal quotation marks omitted)). If a statute requires that the defendant knowingly perform the act that violates the law—even where he need not also know that the act is illegal—then he must knowingly perform the charged *actus reus*, not some other, uncharged act. *See Bryan*, 524 U.S. at 193 ("[T]he term 'knowingly' merely requires proof of knowledge of the facts *that constitute the offense*." (emphasis added)). So, too, with willfulness. The district court and the parties agree that willfulness requires that the defendant "acted with knowledge that his conduct was unlawful." App. 66; *see Bryan*, 524 U.S. at 193. The conduct that he must know was unlawful is the *actus reus* of the crime with which he is charged.

Because the willfulness instruction required only that the defendants acted with knowledge that "the conduct" was unlawful, App. 66, there is some chance that the jury convicted based in part on defendants' evasiveness in importing to Thailand. On retrial, the instruction should make clear that an AECA conviction requires that defendants knew of the unlawfulness of the charged unlicensed export of the items from the United States, and that a willfulness finding cannot draw on evidence that they knew the related, but legally and factually distinct, import of those items into Thailand was illegal.

### C. Burden's Limited English Did Not Render His Interrogation Custodial for *Miranda* Purposes.

We review *de novo* the determination whether Burden was in custody and thus entitled to *Miranda* warnings before any interrogation, and we review the underlying factual findings for clear error. *United States v. Hallford*, 756 F. App'x 1, 5 (D.C. Cir. 2018). If the court erroneously admits a non-Mirandized statement, we must reverse unless the admission was harmless beyond a reasonable doubt. *United States v. Brinson-Scott*, 714 F.3d 616, 622 (D.C. Cir. 2013).

In *Miranda*, the Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. Defendants argue that Burden's limited English abilities rendered the interview "custodial." We disagree. We see no error in the district court's admission of Burden's non-Mirandized statement because Burden was not in custody when the agents questioned him at his warehouse. His English proficiency was not an "objective circumstance surrounding the interrogation" that a reasonable officer would have assumed bore on whether Burden felt free to leave the interview.

*Miranda* warnings are required as a bulwark against the coercive power of being taken into police custody and interrogated. "An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to . . . techniques of persuasion . . . cannot be otherwise than under compulsion to speak." *Miranda*, 384 U.S. at 461. Police custody is sometimes self-evident, as in Miranda's own case: The police arrested him and took him to

a police station interrogation room where they questioned him. *Id.* at 491. But a person is also in custody when he is "otherwise deprived of his freedom of action in any significant way." *Id.* at 444. In "*Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508 (2012).

The Supreme Court has laid out guidelines for the custody analysis. "In determining whether a person is in custody," triggering the duty to give *Miranda* warnings,

> the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave. And in order to determine how a suspect would have gauge[d] his freedom of movement, courts must examine all of the circumstances surrounding the interrogation. Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.

*Id.* at 509 (alterations in original) (internal quotation marks and citations omitted).

"[W]hether a suspect is 'in custody' is an objective inquiry." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011). That means that, while the analysis accounts for "any circumstance that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave," it "involves no consideration of the actual mindset of the particular suspect subjected to police questioning." *Id.* at

271 (internal quotation marks omitted). The benefit of the objective test is practical: It "avoids burdening police with the task of anticipating the idiosyncrasies of every individual suspect and divining how those particular traits affect each person's subjective state of mind." *Id.*

The test, while objective, is also contextual. Because all of the "objective circumstances of the interrogation" must be considered, *Howes*, 565 U.S. at 508, individual characteristics that have an "objectively discernible relationship to a reasonable person's understanding of his freedom of action," such as a child suspect's age, *J.D.B.*, 564 U.S. at 275, must be taken into account. Under circumstances in which "a reasonable child subjected to police questioning will . . . feel pressured to submit when a reasonable adult would feel free to go[,] . . . courts can account for that reality without doing any damage to the objective nature of the custody analysis." *Id.* at 272. That is because age "generates commonsense conclusions about behavior and perception" that "apply broadly to children as a class." *Id.* A reasonable eight-year-old will not necessarily feel free to leave when a reasonable adult would.

Because the test is designed to guide police, a person's youth—or analogous circumstances bearing on a reasonable person's perception of her freedom to leave—only factors into the custody analysis where it "was known to the officer at the time of the interview, or would have been objectively apparent to any reasonable officer." *Id.* at 274. The test thus includes a double inquiry: whether it would have been apparent to a reasonable officer that a reasonable person in the suspect's position would not have felt free to leave. In holding that the suspect's youth was an objective circumstance relevant to the custody analysis, the Supreme Court suggested that other personal characteristics, like blindness, could be similarly relevant. *Id.* at 278. The Court underscored: "Not once have

we excluded from the custody analysis a circumstance that we determined was relevant and objective, simply to make the fault line between custodial and noncustodial 'brighter.'" *Id.* at 280.

Under some circumstances, English language capabilities might have an "objectively discernible relationship to a reasonable person's understanding of his freedom of action" that would bear on the custody analysis for purposes of *Miranda*. *Id.* at 275. Some courts have accordingly factored limited English abilities into the custody inquiry. The Eighth Circuit explained that "the ultimate issue is whether a reasonable police officer conducting [an] otherwise non-custodial interview would have given *Miranda* warnings because he realized that the questioning would be perceived by [the defendant] as custodial due to his limited English language skills." *Thatsaphone v. Weber*, 137 F.3d 1041, 1045 (8th Cir. 1998). In *United States v. Kim*, the Ninth Circuit weighed limited English proficiency (among other factors the court deemed important) because, under the circumstances, it bore on the defendant's ability to understand whether she was a criminal suspect. 292 F.3d 969, 977 (9th Cir. 2002). Kim had arrived at the store her family owned to find many police cars outside and the door locked; the police let her, but not her husband, enter, locked the door, did not let her son (who was already inside) speak to her, and forced her to speak only English, though she and her son informed the officers that she did not speak English well. *Id.* at 971-72. The court held that Kim's interrogation was custodial partly because the police "temporarily took over complete control of Kim's store, creating 'a police-dominated atmosphere,' in which the police kept Kim physically isolated from two family members who could have provided both moral support and, given her limited English, a more complete understanding of the overall situation." *Id.* at 977. Both *Thatsaphone* and *Kim* preceded the

Court's application of the custody analysis to a child in *J.D.B.*, but both decisions comport with *J.D.B.* insofar as they consider whether a reasonable officer would have been able to discern that the language limitations of a reasonable person in the suspect's position would have contributed to that person's not feeling free to leave. Since *J.D.B.*, at least one other court has held a suspect's limited English proficiency relevant to *J.D.B.*'s objective inquiry. *See United States v. Han*, 199 F. Supp. 3d 38, 52-54 (D.D.C. 2016).

The district court in this case correctly held that a reasonable officer would not have thought that Burden's language abilities prevented him from feeling free to leave, and thus properly admitted Burden's non-Mirandized statement. Even though Burden sometimes had trouble formulating responses and appeared to lack perfect comprehension of all the questions, the evidence does not suggest that it would have been apparent to a reasonable officer that Burden was not understanding what was being said.

The defendants identify only one moment, when the DHS officer was explaining the purpose and terms of the interview, when they believe that a reasonable officer should have recognized that Burden's English skills would affect the perception of a reasonable person in his position as to whether he was free to leave:

> UNIDENTIFIED AGENT NO. 1: We are federal agents for the U.S. Government so I have to let you know that you have to be honest with us —
>
> PHEERAYUTH BURDEN: Uh-huh.
>
> UNIDENTIFIED AGENT NO. 1: — okay? If you don't want to answer something, you don't have to answer but you cannot lie to us.

PHEERAYUTH BURDEN: Okay.

UNIDENTIFIED AGENT NO. 1: All right? And you can't withhold relevant information.

PHEERAYUTH BURDEN: Uh-huh.

UNIDENTIFIED AGENT NO. 1: If you do, that is a crime.

PHEERAYUTH BURDEN: Okay

UNIDENTIFIED AGENT NO. 1: Okay? Punishable by up to five years in prison so just please be honest.

PHEERAYUTH BURDEN: Yeah.

App. 174. While the agent's statement was somewhat confusing, it is not clear from this exchange that Burden was not comprehending what the agent was saying to him or somehow believed he could not leave an interview at his own warehouse that he had agreed to by phone and shown up for of his own accord.

The district court did not refuse to consider Burden's proficiency entirely, as defendants assert. It properly applied the custody test by evaluating how a reasonable officer would have perceived Burden's comprehension. It noted "that for each of the points that the Special Agent was communicating to Mr. Burden, Mr. Burden said okay or yes or [uh-huh], reflect[ing] responses like that which would give one reasonably the understanding that Mr. Burden understood what was being said." App. 430-31.

The custody question was not otherwise close. The district court found that Burden "arrived with his wife at his own work place, at the time that he had set and there was no evident effort to overcome his will. There was no effort to put him in handcuffs, no threats, other threats during the course of the interview." App. 431. Burden himself "chose where he was going to sit, he chose the room in which they were going to talk," and he "showed that he knew he could get up, go out, open the door and talk to somebody outside throughout the course of this." App. 432. One of the two agents who questioned Burden testified that Burden had chosen where and when the interview would take place, S.A. 400, and that the agents wore plainclothes and did not display their badges or weapons, S.A. 407. The interview lasted no more than three hours and Burden left when it was over. In sum, "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, . . . the release of the interviewee at the end of the questioning," and other factors all support the conclusion that Burden was not in custody. *Howes*, 565 U.S. at 509 (internal quotation marks and citations omitted). Because Burden's imperfect English would not have given a reasonable officer the impression that a reasonable person in Burden's position would have believed himself detained, it does not change that determination here.

\* \* \*

For the foregoing reasons, we affirm the district court's admission of Burden's non-Mirandized statement to DHS agents. We nonetheless vacate the convictions in view of the error in the admission of Yindeear-Rom's deposition testimony.

*So ordered.*

ROGERS, *Circuit Judge*, concurring in part, and concurring in the judgments: I join the court in reversing the judgments of conviction and remanding the case for a new trial because the district court erred in admitting at trial the deposition of a key government witness taken pursuant to Federal Rule of Criminal Procedure 15. *See* Op. 12–21. As the proponent of the prior testimony, the government had the burden of establishing Yindeear-Rom's unavailability by making reasonable efforts to procure his presence at trial, *see United States v. Lynch*, 499 F.2d 1011, 1022 (D.C. Cir. 1974); FED. R. EVID. 804(a)(5)(A), and failed to offer evidence that it did so. *See* Op. 15–17. The district court's error violated defendants' Confrontation rights under the Sixth Amendment to the Constitution. *See Ohio v. Roberts*, 448 U.S. 56, 74 (1980), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004). The government concedes that if there was error, it was not harmless beyond a reasonable doubt. Appellee's Br. 55 n.5.

In view of our remand for a new trial, *see United States v. Hite*, 769 F.3d 1154, 1167 (D.C. Cir. 2014), I also join two of the court's other conclusions. First, I agree the district court did not err in denying defendant Pheerayuth Burden's motion to suppress statements that he had made during an interview with Department of Homeland Security agents at Burden's suggestion at his warehouse, while his wife was present. Op. 28–34. The district court could reasonably conclude that, under the circumstances, it would not have been "objectively apparent to any reasonable officer," *J.D.B. v. North Carolina*, 564 U.S. 261, 274 (2011), that Burden's lack of fluency in the English language would have prevented him from understanding that he was not detained at the time.

Second, I agree the district court did not err in rejecting the defendants' requested jury instruction on the meaning of "willfully" under the Arms Export Control Act ("AECA"). *See* Op. 21–26. This court now joins the majority of circuit courts of appeal to have considered the issue that the AECA does not

require the government to prove that defendants know the specific items they exported were on the Munitions List.

But I cannot agree that the instruction on "Willful Violation of Arms Export Control Act" ("AECA instruction"), App. 66, failed adequately to define "the conduct" that the jury had to find was "willfully" committed by the defendants. Op. 26–27. When reviewing an instruction for legal error, the "pertinent question is whether, taken as a whole, the instructions accurately state the governing law and provide the jury with sufficient understanding of those issues and applicable standards." *United States v. Vega*, 826 F.3d 514, 524 (D.C. Cir. 2016) (quoting *United States v. Wilson*, 605 F.3d 985, 1018 (D.C. Cir. 2010)). Courts must "consider not just the challenged phrases, but the instruction as a whole." *United States v. Washington*, 106 F.3d 983, 997 (D.C. Cir. 1997) (quoting *United States v. Merlos*, 984 F.2d 1239, 1242 (D.C. Cir. 1993)).

The district court instructed the jury that "[t]hrough the Arms Export Control Act and the International Traffic in Arms Regulations, Congress and the President have made it a criminal offense for anyone *willfully to export or attempt to export from the United States* any defense article without first obtaining a license or written approval from the U.S. Department of State." App. 66 (emphasis added). In the next sentence, the court instructed that "[t]he defendants are charged . . . with specific instances of *willfully exporting* United States Munitions List items . . . in violation of the export control laws." *Id.* (emphasis added). Adding specific details about the alleged unlawful conduct, the district court instructed the jury that Count 2 of the superseding indictment charged the defendants with exporting, in violation of the AECA, two types of items on the U.S. Munitions List: "(1) five AR Style, NATO 5.56, 30 round magazines, and (2) a KAC-Knight Armament

M203 Qd Mount." *Id.* Regarding the word "willfully," the district court instructed the jury that the requisite unlawful intent concerns U.S. export law: "[T]he government need not prove that a defendant had read, was aware of, or had consulted the licensing provisions of the Arms Export Control Act or the International Traffic in Arms Regulations, or the Munitions List . . . [but it] must prove . . . that a defendant knew that the conduct was unlawful." *Id.* The defendants did not otherwise request any instruction on the conduct at issue.

Consistent with the presumption that juries follow instructions, *see Richardson v. Marsh*, 481 U.S. 200, 211 (1987), "a conscientious and attentive juror viewing the instructions as a whole" would not have convicted defendants on the basis of finding a willful mental state with respect to any conduct other than exporting in violation of U.S. law. *United States v. Lemire*, 720 F.2d 1327, 1341 (D.C. Cir. 1983). The AECA instruction made clear that the alleged criminal act was *exporting from the United States*. Because Thai customs law governs *importing into Thailand*, *see* Appellants' Br. 30–31, if the jury understood Burden's only unlawful intent was to evade Thai customs, then it would not have found Burden understood exporting from the United States to be unlawful. Viewed as a whole, the AECA instruction "fairly present[s] the applicable legal principles and standards," *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 556 (D.C. Cir. 1993) (internal quotation marks omitted), and passes the "critical inquiry [of] whether the instructions, viewed in the aggregate, properly guided the jurors in their deliberations," 9C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2558 (3d ed.).

The court nevertheless perceives an instructional ambiguity about the relevant unlawful conduct. *See* Op. 26. Speculating about juror conduct, the court concludes that

"there is some chance that the jury convicted based in part on defendants' evasiveness in importing to Thailand." Op. 27. Instead of analyzing the whole of the district court's AECA instruction, the court focuses on the instruction about willfulness, and imposes a *sua sponte* obligation on the district court upon retrial to instruct the jury that it must find that the "defendants knew of the unlawfulness of the charged unlicensed export of the items from the United States, and that a willfulness finding cannot draw on evidence that they knew the related, but legally and factually distinct, import of those items into Thailand was illegal." Op. 27.

Of course, instructional clarity is desirable. But "the defense had ample opportunity to make clarifying suggestions" as this court now requires, and it did not, *Lemire*, 720 F.2d at 1343 — likely because defense counsel told the jury in closing argument that evidence of Burden's interest in evading Thai customs law explained his behavior without providing evidence of the requisite guilty mind with respect to the violations of U.S. law with which he was charged, *see* Supp. App. 809. Defense silence may further indicate the instructions made clear the precise nature of the willful conduct required to find guilt of the AECA charges. In any event, as noted, there is no basis to conclude there is a "reasonable likelihood" the jury misapplied the challenged instruction, *Boyde v. California*, 494 U.S. 370, 380, 383 (1990), and "[t]he choice of the [words] to be used in a particular instruction . . . is reviewed only for abuse of discretion," *Joy*, 999 F.2d at 556, for it is well settled that "[t]he district judge need not use any particular form of words or sequence of ideas so long as the charge as a whole conveys to the jury a clear and correct understanding of the applicable substantive law without confusing or misleading them." WRIGHT & MILLER § 2556. "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might"; instead,

"commonsense understanding of the instructions in the light of all that has taken place at the trial [is] likely to prevail over technical hairsplitting." *Boyde*, 494 U.S. at 380–81.

For these reasons I concur in part and concur in the judgments.